UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| DANIEL CASTAGNA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:15-CV-249 JD |
| | ) | |
| NEWMAR CORPORATION, et al, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Daniel Castagna bought a recreational vehicle manufactured by Newmar Corporation. Though the vehicle came with a written warranty, Mr. Castagna had a hard time finding appointments to repair the many problems he encountered, and the vehicle spent multiple months out of service for repairs in just the first year. Finally, just over a year after he purchased the vehicle, it experienced a fire involving the power inverter, causing smoke and fire damage. Mr. Castagna alleges that the vehicle is now unusable. He thus sued Newmar, alleging breaches of express and implied warranties and a claim under Indiana's Deceptive Consumer Sales Act. In turn, Newmar asserted a claim against Magnum Energy, Inc., which manufactured the inverter, seeking indemnification for any damages it may owe to Mr. Castagna if the inverter is found to have caused the fire.

Newmar has now filed a partial motion for summary judgment, and Magnum moved for summary judgment on the indemnification claim. They each seek judgment as to any claim arising out of the fire, arguing that there is no evidence that the inverter caused the fire and that the fire occurred after the implied warranty expired. Newmar also seeks summary judgment on Mr. Castagna's claim under the Deceptive Consumer Sales Act, and on some of remedies he seeks. For the following reasons, the Court denies the motions as to the implied warranty.

However, the Court grants Newmar's motion as to the Deceptive Consumer Sales Act claim. The Court also grants Newmar's motion as to Mr. Castagna's request for rescission, but denies it as to his request for consequential damages.

## I. FACTUAL BACKGROUND

Daniel Castagna grew up working in his father's RV dealership, and now owns an online marketing company. In 2013, he and his wife decided that they wanted to buy an RV, so Mr. Castagna began exploring the options available from different manufacturers. He called Newmar's national sales manager, whom he spoke to on six or seven occasions. According to Mr. Castagna, that individual told him that Newmar "had an extremely high quality product," that "they stood behind the product," and that their service was "a step above." Mr. Castagna ultimately decided to purchase a 2014 Mountain Aire model manufactured by Newmar. He purchased the vehicle on July 3, 2013, from North Trail RV, for a total price of $393,255.37.

The vehicle came with a twelve-month limited warranty from Newmar. Under the warranty, Newmar agreed to repair any manufacturing defects that arose within twelve months of the date of purchase. To obtain service, the warranty required a buyer to contact the original dealer or Newmar's customer service department in order to schedule an appointment at a service center. However, the warranty stated that Newmar will not be responsible for any incidental or consequential damages, such as for loss of use of the vehicle, loss of time, or travel expenses. The warranty also stated that the implied warranty of merchantability was limited to a period of twelve months from the date of purchase. Mr. Castagna was aware when he purchased the vehicle that it came with a warranty, and he signed a warranty registration form at the time of the purchase. However, he denies having received the warranty itself or being aware of the limitations at the time of his purchase.

Mr. Castagna alleges that he began experiencing problems with the vehicle immediately after the purchase. In fact, it was in the shop for the first time the very next day. Mr. Castagna states that the vehicle was in the shop for a laundry list of repairs at least thirteen times over the first year, spanning 145 days (though a portion of that time appears to have been due to a collision in which the vehicle was involved). Over that time, Mr. Castagna drove the vehicle from Florida, then up to Indiana, then to southern California and the southeast, and then to northern California. There, the vehicle was parked for some time at a home at which Mr. Castagna's son was staying in Covelo, California.

On August 5, 2014, as Mr. Castagna's son was returning home from dinner, he saw smoke coming out of the vehicle. He and his friend disconnected the vehicle from shore power and looked inside the vehicle and in its basement compartments to see if they could find a fire, but did not find one. However, the basement compartments had suffered smoke and fire damage. Sometime later, the vehicle was towed away from the site. In order to tow the vehicle, the tow truck driver had to repair the vehicle's air lines in order to release its brakes. To do so, he had to clear out debris from inside the basement compartments, but those contents were not preserved.

Over the ensuing months, the vehicle was inspected on a number of occasions by representatives of Mr. Castagna, Newmar, and an insurance company. In the course of those inspections, they determined that the fire involved the vehicle's power inverter, which was manufactured by Magnum Energy. An inverter is a device that converts direct current from batteries into alternating current for use in appliances in the vehicle like microwaves. If the vehicle is plugged into external power, the inverter can also convert alternating current to direct current to charge the vehicle's batteries.

The parties have each retained experts to determine the fire's cause. The experts appear to agree that the inverter suffered a failure, but disagree as to the cause. Magnum's expert opined that a fire of unknown origin began in the vehicle's basement. He believes that the fire then caused a fault in electrical lines outside of the inverter, sending 120-volt alternating current into the 12-volt direct current lines, which then traveled to the inverter and caused it to fail. He concluded that the inverter performed as intended, and was a victim of the fire, not its cause. Newmar's expert reached a similar conclusion.

Mr. Castagna retained three experts who each disagree with those conclusions.[1] They did not locate any source of electrical activity outside of the inverter that could have caused the fault in the inverter. They also opined that the damage in the basement compartments indicated that the fire began at the inverter and then spread outward. Due to the fire damage to the inverter and the unexplained loss of certain components after the fire, they could not identify what caused the fault within the inverter. However, they opined that the failure was consistent with an electrical discharge within one of the inverter's components. The failure within the inverter would have been forceful enough to expel heated gases and flames into the vehicle. They believe that this caused other materials in the vehicle's basement compartments to catch fire, before the fire self-extinguished due to a lack of fuel and oxygen.

Mr. Castagna alleges that the fire and the vehicle's other defects have rendered it unusable. He thus filed this action against Newmar asserting claims for breach of express and implied warranties. He raises each of those theories under state law and the federal Magnuson–Moss Warranty Act. He also asserts a claim under Indiana's Deceptive Consumer Sales Act.

---

[1] For simplicity, the Court refers here to the experts collectively, but it identifies each expert's specific opinions below in addressing the defendants' challenge to this claim.

Newmar then asserted a claim for indemnification against Magnum, to the extent it may be held liable to Mr. Castagna due to a fault with the inverter.[2] Discovery has now closed, and both defendants have filed motions for summary judgment.

## II. PRELIMINARY MOTIONS

Before addressing the substance of the motions for summary judgment, there are a number of preliminary matters to discuss. First, Newmar filed a motion to strike various materials Mr. Castagna submitted in response to summary judgment. The argument portion of Newmar's motion is so conclusory that it often forgoes even using grammar. [*E.g.*, DE 117 p. 4 ("¶ 6, violates FRE 801-802, statement 'fixed as promises [*sic*] indicates hearsay"); ("¶'s 14, 15 & 16 violates [*sic*] FRE 701, not helpful. Plaintiff just choosing sides.")]. Newmar seeks to strike a total ten expert reports and affidavits with the following argument: "(a) Violates FRE 403 and 801-802. (2) Expert reports under FRCP26 [*sic*] are not independently admissible. (c) Reports prepared with an eye toward litigation are not admissible. (d) Reports rely on hearsay and allowance would be creating a hearsay conduit." [DE 117 p. 3 (case citations omitted)]. Those might be appropriate as subheadings to introduce developed arguments, but here they constitute the entirety of Newmar's argument as to these extensive materials. The Court thus finds that Newmar's objections are waived as undeveloped.

In addition, to the extent the Court can discern Newmar's arguments from its terse discussion, those arguments are meritless. For example, while expert reports generally cannot be admitted into evidence at trial, that does not mean they cannot be used at summary judgment,

_____

[2] The Court has jurisdiction over the Magnuson–Moss claim under 28 U.S.C. § 1331, as the amount in controversy exceeds $50,000, 15 U.S.C. § 2310(d)(3), and the Court has supplemental jurisdiction over the remaining claims. 28 U.S.C. § 1367. Though Mr. Castagna's complaint also alludes to diversity jurisdiction under 28 U.S.C. § 1332, it does not allege the citizenship of any party, so the Court does not have jurisdiction on that basis.

which is by definition resolved on a paper record instead of through live testimony. Though the reports themselves were not authenticated with sworn declarations, there is no reason to believe the experts here will not testify consistent with their written reports at trial. Rule 56(c)(2) allows a party to object that the material cited "*cannot be presented* in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2) (emphasis added), but the content of the reports can be presented in admissible form at trial—through the experts' testimony—so the reports need not be stricken on that basis. Newmar also objects that the reports were prepared with an eye toward litigation, but that is inherently the case for retained experts; that does not make their opinions inadmissible. Newmar also raises Rule 403, which is a puzzling objection at summary judgment. If a fact is necessary to the outcome of the motion, then its probative value could not be substantially exceeded by any danger of prejudice, so the evidence could not be stricken on that basis. And if the fact is not necessary to the outcome of the motion, then it need not be stricken anyway. In addition, concerns about unfairly prejudicing a party in the eyes of the jury or presenting cumulative evidence are not applicable at summary judgment, which tests the sufficiency of the evidence. Newmar has thus not adequately presented any argument that warrants striking these materials.

Newmar also moves to strike various paragraphs of Mr. Castagna's affidavit with similarly succinct objections. It repeatedly objects on hearsay grounds to Mr. Castagna explaining what Newmar's employees told him, but statements by a party–opponent are not hearsay. Newmar's other objections are either undeveloped or inapplicable, or address matters that are not material to the resolution of the motion. Therefore, Newmar's motion to strike is denied.

Next, Magnum filed two motions to strike testimony by Mr. Layson, one of Mr. Castagna's retained experts, on the basis that the opinions were not timely disclosed under Rule 26. Mr. Layson issued a written report as required, but Magnum argues that, during his deposition, Mr. Layson offered opinions beyond the scope of his report. Magnum thus moves to strike those opinions. It also argues that Mr. Layson offered another new opinion in response to its motion to strike, so it filed a separate motion to strike that opinion.

The Court denies these motions to strike. First, none of the opinions in question are necessary to the outcome of the motion for summary judgment. Second, even assuming these are new opinions that were not timely disclosed, Magnum has not shown that they should be stricken. Under Rule 37(c)(1), a party cannot use evidence that was not timely disclosed as required under Rule 26, "unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1); *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). Here, Magnum has not identified any cognizable harm. In its opening brief, Magnum argues that the testimony is confusing, misleading, and vague, but that is an attack on its substance, not its timeliness; the testimony would be no more or less confusing, misleading, or vague had it been disclosed earlier. In its reply brief, Magnum argues that it was prejudiced because, without a proper disclosure, it would not have learned about these opinions until trial if it hadn't deposed Mr. Layson. Magnum *did* depose Mr. Layson, though, and it has not shown how it is any worse off for having learned of these opinions during Mr. Layson's deposition instead of in his report.

A party might argue that a late disclosure of expert opinions prevented the party from conducting follow-up discovery into those opinions or having their own expert respond to those opinions, but Magnum does not do so. In fact, its own expert did not address or respond to any of the opinions in Mr. Layson's written report, so there is no reason to believe he would have

addressed or responded to any of these "new" opinions if given the chance. In addition, even if the opinions at issue are new, they each relate to and arise out of matters that Mr. Layson did discuss and opine on in his initial report.[3] Thus, in the absence of any plausible argument to the contrary, Mr. Castagna has shown that the disclosure, even if untimely, was harmless. Magnum also seeks to strike a paragraph of an affidavit submitted by plaintiff's counsel in response to the first motion to strike, but that is immaterial and does not warrant discussion. Thus, Magnum's motions to strike are denied.

Finally, the Court notes that Mr. Castagna filed his entire response brief and supporting materials [DE 104] under seal, without ever filing a motion for leave to file the documents under seal. That is unacceptable. If information in a filing meets the high standard for keeping an item in the public record under seal, *see Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 546 (7th Cir. 2002) (stating that only trade secrets, information covered by a recognized privilege, and information required by statute to be maintained in confidence may be filed under seal), the filing party must move to maintain the filing under seal, and must publicly file any remaining materials. Mr. Castagna never publicly filed any of these materials—the vast majority of which have no conceivable justification for sealing—and has not moved to maintain them under seal. Accordingly, unless any party files a motion to seal within fourteen days, the Court will direct the Clerk to unseal this filing.

### III.  STANDARD OF REVIEW

Summary judgment is proper when the movant shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[3] For example, Mr. Layson stated in his report that the fire in the inverter was forceful enough to expel "gases and flames" into the vehicle. Magnum now seeks to strike the new opinion that the fire was forceful enough to expel gases, flames, and "particles."

56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999).

## IV. DISCUSSION

Mr. Castagna asserts claims for beaches of express and implied warranties, raising each of those theories under Indiana law (Count 1) and the Magnuson–Moss Act (Count 2). He also asserts a claim under Indiana's Deceptive Consumer Sales Act (Count 3). Newmar and Magnum have each moved for summary judgment that Mr. Castagna is not entitled to recover for the fire damage, which underlies his implied warranty claims. Newmar has also moved for summary judgment on Mr. Castagna's claim under the Deceptive Consumer Sales Act, and his requests for rescission and for consequential damages. The Court addresses each in turn.

### A. Breach of Implied Warranty of Merchantability

The defendants both move for summary judgment as to the implied warranty of merchantability. The implied warranty is important in this case because the fire occurred shortly after the express warranty's term expired, so Mr. Castagna could only recover for the fire damage through a breach of the implied warranty of merchantability. In seeking summary

judgment, Newmar and Magnum first argue that the evidence does not support Mr. Castagna's claim that the fire was caused by the inverter, as opposed to some other source that would not implicate the implied warranty. They also argue that the express warranty limited the term of any implied warranties as well, and that the fire occurred outside of that term. The Court disagrees on both counts.

### 1. Breach

"[A] warranty that goods shall be merchantable is implied in *all* sales contracts if the seller is a merchant with respect to goods of that kind." *Frantz v. Cantrell*, 711 N.E.2d 856, 859 (Ind. Ct. App. 1999). That warranty extends to manufacturers as well. *Hyundai Motor Am., Inc. v. Goodin*, 822 N.E.2d 947, 948 (Ind. 2005). To be merchantable, goods must pass without objection in the trade and be fit for the ordinary purpose for which such goods are used. Ind. Code § 26-1-2-314(2). A claim for breach of the implied warranty of merchantability requires a plaintiff to show "not only the existence of the warranty but that the warranty was broken and that the breach of warranty was the proximate cause of the loss sustained." *Frantz*, 711 N.E.2d at 860.

Proving a breach of the implied warranty of merchantability requires showing that the product was defective in some respect such that it was not merchantable. *Markwell v. Gen'l Tire & Rubber Co.*, 367 F.2d 748, 749 (7th Cir. 1966). However, "it is not necessary to prove the specific defect in the product." *A.A.A. Exteriors, Inc. v. Don Mahurin Chevrolet & Oldsmobile, Inc.*, 429 N.E.2d 975, 978 (Ind. Ct. App. 1981); *see Coachmen Indus., Inc. v. Kemlite*, No. 3:06-cv-160, 2008 WL 4858385, at *14 (N.D. Ind. Nov. 10, 2008) ("Under Indiana law, while it is necessary for Coachmen to establish that [the product] was defective, Coachmen need not establish the specific defect in the [product]."). As explained in *A.A.A. Exteriors*, the issue "is not whether a specific defect caused the breach of this warranty (of merchantability), but, rather,

whether or not the seller has sold goods that were not merchantable." 429 N.E.2d at 978. Absent evidence of a specific defect, a plaintiff could rely on circumstantial evidence that the product was defective. *Id.* In addition, Indiana courts have recognized that "a malfunction itself, in the absence of abnormal use and reasonable secondary causes, may be sufficient evidence of a defect to make the existence of a defect a question for the jury." *Id.*; *see also Fairmont Homes, Inc. v. Bluelinx Corp.*, No. 3:09-cv-323, 2011 WL 4729877, at *5 (N.D. Ind. Oct. 4, 2011); *Kucik v. Yamaha Motor Corp., U.S.A.*, 2:08-cv-161, 2010 WL 2694962, at *7 (N.D. Ind. 2010) ("'The courts would obviously prefer . . . to have proof of a specific defect causing the harm. But this is not always possible, especially in cases where the product has been destroyed due to its malfunction. . . . If there is sufficient other evidence that harm was caused by some unspecified defect and no other cause likely, the plaintiff ordinarily has made a submissible cause.'" (quoting *SCM Corp. v. Letterer*, 448 N.E.2d 686, 691 (Ind. Ct. App. 1983))).

Here, there is no question that a vehicle that causes a fire is not fit for its ordinary purpose.[4] *A.A.A. Exteriors*, 429 N.E.2d at 978 ("It seems clear that a truck with an overheating transmission [that causes a fire] does not meet the test of merchantability."). The parties dispute, however, whether the vehicle caused the fire, or was only the victim of a fire caused by another source for which the defendants are not responsible. Mr. Castagna argues that the fire was caused by an existing defect in the inverter, which he argues suffered a failure that caused a fire that spread to other areas in the vehicle's basement. The defendants argue that the fire started by some other, unknown reason, and that the vehicle and its inverter were victims of the fire, not its cause.

---

[4] Mr. Castagna argues that the vehicle was not merchantable due to other defects as well. Since the fire forms the basis of the claim against Magnum, and since there is a dispute of fact on that issue, the Court focuses its analysis on the fire and need not reach any other bases for this claim.

In its motion summary judgment, Magnum largely relies on the premise that Mr. Castagna must prove either a design defect—which entails proving both that the product was unreasonably dangerous and that a safer alternative existed—a manufacturing defect, or a failure to warn. This is not a strict products liability case, though, so those categories of defects are not applicable. A plaintiff's burden is rather to show that the product was not merchantable:

> Proof of the specific defect in construction or design causing a mechanical malfunction is not an essential element in establishing breach of warranty. When machinery malfunctions, it obviously lacks fitness regardless of the cause of the malfunction. Under the theory of warranty, the "sin" is the lack of fitness as evidenced by the malfunction itself rather than some specific dereliction by the manufacturer in constructing or designing the machinery.

*A.A.A. Exteriors*, 429 N.E.2d at 978. And as already noted, a plaintiff need not be able to identify the specific defect that causes the product to be unfit for its ordinary use. *Id.*

The Court must therefore consider whether Mr. Castagna has submitted evidence from which the jury could conclude that the fire was caused by the vehicle and its inverter, whether or not he can prove the specific defect that caused the fire. The Court finds that he has. Mr. Castagna retained three experts to examine the source of the fire. John Powell, a certified fire investigator, opined that the fire originated inside the inverter. [DE 104-28 ("the thermal event originated inside the Magnum's case")]. He noted that the soot deposits indicate that the fire began inside the inverter and then spread outward, and that the damage showed "very directional patterns to demonstrate heat transfer from the area of the inverter." *Id.* p. 4. His examination of the vehicle showed "no evidence of electrical faulting other than that seen in the inverter." *Id.* He also noted that the vehicle's wiring had been repaired at one point, but he found no evidence that the repairs affected the inverter. He further noted that the inverter contained only the components that were installed during its manufacture.

Peter Layson, an expert in electrical system and appliance failures, also examined the vehicle and the inverter. [DE 104-27]. He found that the only electrical ignition source identified in the area of the fire was the inverter, and that the inverter was the only device that exhibited electrical activity consistent with a competent ignition source for a fire. None of the wiring outside of the inverter revealed electrical activity that could have started a fire. He also found no electrical arcing activity outside the inverter, and no evidence of overcurrent heating outside the inverter. *Id.* p. 6. He further opined that the electrical activity within the inverter was consistent with an electrical discharge event at an internal component called the "FET board." Since the board was heavily damaged in the fire, though, he could not identify the specific mechanism that caused the discharge. Finally, he opined that the failure within the inverter was forceful enough to expel heated gases and flames to the outside of the inverter.

Finally, Thomas Bailey, another certified fire examiner, inspected the vehicle and the inverter and considered Mr. Layson's opinions. [DE 104-13]. He concluded that the fire was not incendiary, meaning it was not started on purpose. He further opined that the fire began at the inverter, and that the fire then ignited other combustible material outside the inverter. Once the fire began, it followed the path of available fuel and oxygen, spreading to other compartments. Due to a shortage of oxygen and fuel in the enclosure, though, the fire eventually self-extinguished.

These opinions suffice to allow a jury to conclude that the fire was caused by the inverter, even though the defendants suggest a number of other possibilities. As the defendants argue, a plaintiff may not recover "where the facts proven show that there are several possible causes of an injury, for one or more of which the defendant was not responsible and it is just as reasonable and probable that the injury was the result of one cause or the other." *Royal Bus. Machs., Inc. v.*

*Lorraine Corp.*, 633 F.2d 34, 46 (7th Cir. 1980). At summary judgment, though, a plaintiff need only offer evidence from which a jury could find that the defendant's fault is more likely. *A.A.A. Exteriors*, 429 N.E.2d at 978–79. Here, Mr. Castagna's experts have adequately addressed and discounted other possible causes, which would allow the jury to make that finding.

The defendants suggest that wires outside of the inverter may have shorted—either due to a fire that had already started from another source, or perhaps due to a water leak or another reason—and sent a surge into the inverter, causing its failure. However, Mr. Layson and Mr. Powell both opined that there was no evidence of electrical faulting outside of the inverter. [DE 104-27 p. 6; DE 104-28 p. 4]. The defendants also note that after the fire, the contents of the basement compartments were removed so that the vehicle could be repaired enough to get towed, and that those contents were not preserved.[5] They thus argue that Mr. Castagna cannot rule out the possibility that the fire was started by those materials. However, Mr. Castagna's fire investigators observed that the fire pattern flowed from inside the inverter to the outside, which indicates that the inverter did not fail because it was consumed by a fire. In addition, as already noted, Mr. Castagna's experts did not see any evidence of electrical activity outside of the inverter that might have caused a surge capable of causing the inverter's failure, despite the presence of some fire damage to the wiring. The defendants also note that repairs had been made to the vehicle's electrical system, but Mr. Powell found no evidence that any repairs affected the inverter or that there was any abnormal electrical activity related to those repairs. The defendants also argue that Mr. Castagna has been unable to identify any specific defect in the inverter that

---

[5] Magnum also suggests that the Court should dismiss the claim as a sanction for the loss of evidence. There is no indication that any evidence was lost willfully or in bad faith, though, nor have the defendants adequately shown that they have been prejudiced to the extent that the extreme sanction of dismissal would be justified.

caused it to catch fire, but as already discussed, proof of a specific defect is not required. *A.A.A. Exteriors*, 429 N.E.2d at 978. Accordingly, the Court finds there to be a genuine dispute of fact as to whether the inverter caused the fire, so summary judgment is not warranted on that basis.

### 2.    Limited Term

The defendants next argue that the express warranty limited the term of the implied warranty of merchantability, such that it expired before the fire. The warranty states, "Any implied warranties as to the Newmar Corporation Recreational Vehicle including any warranty of merchantability or fitness for a particular purpose or use are limited to a period of twelve (12) months immediately following the original retail owner's date of purchase as therefore stipulated." [DE 104-3]. The date of purchase was July 3, 2013, and the fire occurred over a year later, in August 2014, so the fire would be outside the term of the implied warranty if this provision is enforceable.

Under Magnuson–Moss, "implied warranties may be limited in duration to the duration of a written warranty of reasonable duration, if such limitation is conscionable and is set forth in clear and unmistakable language and prominently displayed on the face of the warranty." 15 U.S.C. § 2308(b). This provision applies both to claims under Magnuson–Moss and to claims under state law. *Id.* § 2308(c); *see also* Ind. Code § 26-1-316(2) ("[T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous . . . ."). Mr. Castagna argues that the limitation here is not enforceable because it is not "prominently displayed on the face of the warranty." The Court agrees.

A limitation generally satisfies this condition if it is emphasized or set off from the remainder of the content of the warranty in some way. For example, courts have noted that "[t]ext that is bold, written in all capital letters, and otherwise set apart satisfies § 2308." *Popham*

*v. Keystone RV Co.*, No. 3:15-cv-197, 2016 WL 4993393, at *8 (N.D. Ind. Sept. 19, 2016)

(finding the limitation to be sufficiently prominent where it was set forth in bolded text under the

bolded headline "Warranty Disclaimers"); *see also Perry v. Gulf Stream Coach, Inc.*, 814 N.E.2d

634, 646 (Ind. Ct. App. 2004) ("Language in the body of a form is conspicuous if it is capitalized

or in larger, or other contrasting, type or color."); *Hahn v. Ford Motor Co., Inc.*, 434 N.E.2d 943,

948 (Ind. Ct. App. 1982). Other methods can suffice as well, like requiring the consumer to sign

or initial next to the limitation. *Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078,

1084 (Ind. 1993), *abrogated on other grounds by Goodin*, 822 N.E.2d 947.

     The limitation at issue here has none of those features. Its text is the same size as (or

smaller than) the rest of the language in the warranty, and it is not in bold, underlined, or

capitalized font. The text is also quite small and does not include a heading. In fact, the language

in question is the middle sentence of a three-sentence paragraph toward the bottom of the page:

> This warranty is expressly in lieu of any other express warranties, written or verbal, made on the part of Newmar Corporation, which corporation does not undertake responsibility to any purchaser of its products for any undertaking, representation or warranty made by dealers beyond those herein expressed. Any implied warranties as to the Newmar Corporation Recreational Vehicle including any warranty of merchantability or fitness for a particular purpose or use are limited to a period of twelve (12) months immediately following the original retail owner's date of purchase as therefore stipulated. Some states do not allow limitations on how long an implied warranty lasts, so the above limitations may not apply to you.

By comparison, the very next paragraph is in all-bold font, and other language in the warranty is

set in bold or all-capitalized font. Under those circumstances, if there is any language that a

reader would likely overlook in this warranty, it would be this limitation. *See Paper Mfrs. Co. v.*

*Rescuers, Inc.*, 60 F. Supp. 2d 869, 879 (N.D. Ind. 1999) (holding that a disclaimer was

unenforceable where it was "in very small type that is difficult to read" and was "not set apart in

a manner that calls attention to it").

     Newmar argues in response that the warranty notes a number of times that it is a "Twelve

Month Limited Warranty." However, the fact that a manufacturer offers an express warranty for

a term of twelve months does not mean that the implied warranty of merchantability—which

exists apart from any express warranty—is also so limited. An express warranty could equally exist for twelve months without any limitation at all on the implied warranty of merchantability. To be enforceable, the language limiting the term of that distinct warranty needs to be prominently displayed, and the language at issue here is not. Accordingly, the limitation on the term of the implied warranty is not enforceable, so the Court denies the motion for summary judgment as to the claims for beach of the implied warranty of merchantability.

## B. Deceptive Consumer Sales Act

Newmar next moves for summary judgment on Mr. Castagna's claim under the Indiana Deceptive Consumer Sales Act. The Act gives a consumer a cause of action against a supplier that engages in a "deceptive act." Ind. Code § 24-5-0.5-4(a). The Act specifies a number of "representations as to the subject matter of a consumer transaction" that constitute deceptive acts, including:

> (1)  That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have.
>
> (2)  That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not.
>
> . . . .
>
> (8)  That such consumer transaction involves or does not involve a warranty, a disclaimer of warranties, or other rights, remedies, or obligations, if the representation is false and if the supplier knows or should reasonably know that the representation is false.

*Id.* § 24-5-0.5-3(a).[6]

---

[6] The Act has since been revised to define deceptive acts more broadly, but the Court applies the version of the act that was in effect at the time of the sale. *See Hoopes v. Gulf Stream Coach, Inc.*, No. 1:10-CV-365, 2014 WL 4829623, at *11 n.9 (N.D. Ind. Sept. 29, 2014).

A deceptive act is actionable only if it is "incurable" or "uncured." *Id.* § 24-5-0.5-4(a); *Perry*, 814 N.E.2d at 647. An incurable deceptive act is a deceptive act "done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." Ind. Code § 24-5-0.5-2(8). That type of deceptive act is not at issue here. An uncured deceptive act does not require a scheme to defraud, but it does require that the buyer give notice to the supplier to provide an opportunity to cure the alleged fault. *Id.* §§ 24-5-0.5-2(7), -5(a). The notice must "state fully the nature of the alleged deceptive act and the actual damage suffered therefrom." *Id.* § 24-5-0.5-5(a); *A.B.C. Home & Real Estate Inspection, Inc. v. Plummer*, 500 N.E.2d 1257, 1262 (Ind. Ct. App. 1986) ("The notice required by [the Act] must contain not only a complete description of the actual damage suffered, but also a description of the alleged deceptive act. The obvious reason for this requirement is so that the supplier has an opportunity to correct the problem."). The notice must be provided "within the sooner of (i) six (6) months after the initial discovery of the deceptive act, (ii) one (1) year following such consumer transaction, or (iii) any time limitation, not less than thirty (30) days, of any period of warranty applicable to the transaction." *Id.*

In support of this claim, Mr. Castagna offers two categories of alleged deceptive acts. First, he argues that Newmar's breach of the express warranty constitutes a deceptive act. Second, he argues that prior to the sale, Newmar's national sales manager made several false statements about the quality of Newmar's vehicles and service. Beginning with the warranty, Mr. Castagna argues that Newmar committed a deceptive act by breaching the warranty. He does not identify any alleged misrepresentation, though; his argument rests on the premise that every breach of a warranty constitutes a deceptive act. Mr. Castagna does not cite any authority in support of that categorical premise. While a misrepresentation *about* a warranty can constitute a

deceptive act, Ind. Code § 24-5-0.5-3(a)(8) (stating that a deceptive act can be a misrepresentation that a transaction "involves or does not involve a warranty"), the Act does not identify a breach of a warranty as a deceptive act, *id.* § 24-5-0.5-3(a). *See Lawson v. Hale*, 902 N.E.2d 267, 274 (Ind. Ct. App. 2009) (noting that "the categories of deceptive acts giving rise to liability under the [Act, prior to its revision,] are very specifically defined"). The warranty here obligates Newmar to repair any manufacturing defects, but it does not make any representations about the performance or quality of the vehicle. [DE 104-3].

In addition, the Indiana Supreme Court has held that a breach of warranty alone is not enough to constitute a deceptive act. In *McKinney*, the plaintiff alleged that the defendant "made promises—sometimes in the form of warranties and guarantees—and then failed to perform." *McKinney v. States*, 693 N.E.2d 65, 73 (Ind. 1998). The court found that those promises did not constitute deceptive acts: "Although these allegations may support a breach of contract claim, without more flesh these bare bones do not state claims under the Act. A broken promise is not ipso facto a false representation." *Id.* Here, Mr. Castagna argues that Newmar breached its warranty, but he never develops any argument as to how that rises to a deceptive act, instead of just a run-of-the-mill breach of warranty claim. Thus, he has not shown that Newmar committed a deceptive act in this respect.[7]

Mr. Castagna also alleges that Newmar's national sales manager made a number of false statements about the quality and performance of the vehicle. The statements in question are that Newmar "had an extremely high quality product," that "they stood behind the product," and that

---

[7] Evidence of a breach of warranty will sometimes overlap with evidence of a deceptive act. For example, if a seller represents that a product has a specific function, a failure to repair a defect in that function could establish both a breach of a warranty and an uncured deceptive act. *See Hoopes*, 2014 WL 4829623, at *13. Mr. Castagna does not develop an argument along those lines, though.

their service was "a step above."[8] [DE 104-9 p. 4, 8]. These statements are each too general to constitute actionable misrepresentations, though. The Indiana Supreme Court has held that statements that are "puffing," meaning "statements of unverifiable *opinion*," are not actionable. *Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327, 332 (Ind. 2013) ("Since puffing is merely a statement of *opinion*, it cannot be a representation of *fact*—and thus, cannot be 'deceptive' under the [Act]."). In *Kesling*, the court held that describing a car as "sporty" and as a "great value" could not constitute a misrepresentation. *Id.* It also noted that describing a product as "top quality" was classic, non-actionable puffery. *Id.* (citing *Rispens*, 621 N.E.2d at 1082–83). Similarly, to be actionable as a representation that a product is of a particular standard, quality, or grade, "the representation must be referential; that is, it must compare the goods to an objective and independent standard." *McCormick Piano & Organ Co., Inc. v. Geiger*, 412 N.E.2d 842, 848 (Ind. Ct. App. 1980); *Lawson*, 902 N.E.2d at 273.

The alleged representations here—that Newmar made a "high level product," that it "stood behind" its products, and had service "a step above"—are similar to the puffery in *Kesling* and *Rispens*. They do not refer to any objective standard or make verifiable factual assertions about Newmar's product or service. Rather, they are "'empty superlatives on which no reasonable person would rely,' or 'meaningless sales patter.'" *Kesling*, 997 N.E.2d at 333.

---

[8] Mr. Castagna's brief also states in passing that he "later discovered that there were extensive limitations to the Newmar warranty that he was never told about prior to his purchase." [DE 104 p. 21]. However, he does not identify what limitations he is referring to (it appears from the warranty that every aspect of the vehicle is covered either by Newmar or by the manufacturer of the particular component); he does not identify any misrepresentation about the scope of the warranty that could serve as a deceptive act; and he does not identify any notice in which he raised that issue to Newmar.

Accordingly, since Mr. Castagna has not identified any actionable deceptive act, the Court grants summary judgment on the Deceptive Consumer Sales Act claim.[9]

## C.    Rescission and Revocation

Next, Newmar moves for summary judgment on Mr. Castagna's request for rescission of the transaction or revocation of his acceptance of the RV. Newmar argues that it was not a party to the sale between Mr. Castagna and North Trail RV—the dealer that sold the RV—so it is not possible to rescind or revoke that transaction against Newmar. District courts applying Indiana law have uniformly agreed with that position, holding that "without contract privity, a buyer cannot revoke a contract against a remote manufacturer." *Skodras v. Gulf Stream Coach, Inc.*, No. 3:08 CV 441, 2010 WL 145370, at *5 (N.D. Ind. Jan. 8, 2010); *see also Hoopes*, 2014 WL 4829623, at *14; *Pizel v. Monaco Coach Corp.*, 364 F. Supp. 2d 790, 795 (N.D. Ind. 2005). As discussed in *Skodras*, Indiana law permits revocation of acceptance against a "seller," but a party that only manufactures the vehicle is not a seller. 2010 WL 145370, at *4–5. Judge Springmann acknowledged that point in ruling on Newmar's motion to dismiss; though she declined to strike this request for relief at the pleading stage, she noted that these remedies "are unavailable to a plaintiff who has only sued a remote manufacturer." [DE 56 p. 19].

In response, Mr. Castagna states that those cases were wrong, but he never develops an argument as to *why* they were wrong. Mr. Castagna also argues that the Court should instead follow the Indiana Court of Appeals' decision in *Perry*, but that decision said nothing about this

---

[9] The Court therefore need not resolve whether Mr. Castagna complied with the notice requirement, but that is questionable. A notice must identify not only the damage suffered but also the deceptive act. *A.B.C. Home*, 500 N.E.2d at 1262 (finding the notice to be inadequate where the plaintiffs identified the problems they were having but did not apprise the defendant of the nature of the deceptive act). Mr. Castagna identified three emails he or his wife sent to Newmar within one year of the transaction, but while those notices identify defects in the vehicle and complain about Newmar's service, it would take a very generous reading to interpret those emails as identifying any deceptive acts.

issue. *Perry* held that when an exclusive remedy fails of its essential purpose, a plaintiff may seek other remedies provided by Indiana Uniform Commercial Code; it never suggests that those remedies include rescission against a remote manufacturer. 814 N.E.2d at 644. Accordingly, the Court grants Newmar's motion for summary judgment on this issue.

**D.      Consequential Damages**

Finally, Newmar moves for summary judgment on Mr. Castagna's request for incidental and consequential damages on his breach of warranty claims. Newmar relies on the warranty's express exclusion of those damages: "Newmar Corporation will not be responsible for any incidental or consequential damages including (but not limited to) loss of use of vehicle, loss of time, inconvenience, expenses for travel, lodging, telephone, transportation charges, loss or damages to personal property, or loss of income." [DE 104-3 (bold, all-caps font omitted)]. Newmar asks to enforce that exclusion.

In response, Mr. Castagna argues that this provision is unenforceable because the warranty failed of its essential purpose. However, the Indiana Supreme Court has held that that is not a ground for declining to enforce a limitation or exclusion of consequential damages. *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 746 N.E.2d 941, 947 (Ind. 2001) (adopting the view that "the failure of a limited remedy has no effect on an exclusion of consequential damages"). A limitation of *remedies* may be unenforceable if the remedy would fail of its essential purpose, but a limitation on *damages* is unenforceable only if it is unconscionable. Ind. Code § 26-1-2-719(3) ("Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable."); *Rheem*, 746 N.E.2d at 947 ("A limited remedy will be struck when it fails of its essential purpose; an exclusion of consequential damages fails when it is unconscionable."); *see also Swan Lake Holdings, LLC v. Yamaha Golf Cart Co.*, No. 3:09-CV-228, 2010 WL 3894576, at *7 (N.D. Ind. Sept. 27, 2010) ("[W]hether a limited remedy fails of

22

its essential purpose has no bearing on the analysis of the effectiveness of an attempt to exclude consequential damages."); *Skodras*, 2010 WL 145370, at *6 ("As to the exclusion for incidental and consequential damages, even if Gulf Stream's express warranties did in fact fail in their essential purpose, the limitation of liabilities contained in the warranty will stand unless it is unconscionable."). Mr. Castagna's argument that the limited remedy failed of its essential purpose is thus inapplicable to whether the exclusion of incidental and consequential damages is enforceable.

Mr. Castagna also argues that this exclusion is unconscionable. Unconscionability is a question of law for the court to decide. *Rispens*, 621 N.E.2d at 1086; *Hahn*, 434 N.E.2d at 951. The Seventh Circuit has "described Indiana as 'unfriendly' to unconscionability generally."[10] *Jackson v. Bank of Am. Corp.*, 711 F.3d 788, 792 (7th Cir. 2013) (noting that "[a]lthough Indiana recognizes unconscionability, courts do not regularly accept it as an argument"). Indiana recognizes two "branches" of unconscionability: substantive and procedural. *Id.* Substantive unconscionability refers to "oppressively one-sided and harsh terms of a contract." *Hahn*, 434 N.E.2d at 951. However, "Indiana courts have rejected claims that contractual limitations of remedy are substantively unconscionable." *Rispens*, 621 N.E.2d at 1087; *Hahn*, 434 N.E.2d at 951. Mr. Castagna focuses instead on procedural unconscionability, which arises "from irregularities in the bargaining process or from characteristics peculiar to one of the parties." *DiMizio v. Romo*, 756 N.E.2d 1018, 1024 (Ind. Ct. App. 2001). Mr. Castagna argues that there was a disparity in bargaining power, as he was purchasing his first RV, has limited education, and the warranty was contained in a form document. However, Mr. Castagna is a high school

---

[10] Mr. Castagna only cites cases applying Illinois law in discussing unconscionability, and has thus failed to develop an argument as to how the limitation would qualify as unconscionable under Indiana law.

graduate, attended college for four-and-a-half years, and has many years of experience in the RV industry. His father owned an RV dealership, at which Mr. Castagna began working in the second grade. By age 13, he was a salesperson at the dealership, and by age 20 or 21 he was the general manager. He also worked as the finance manager, rental manager, and underwriter. [DE 99-9 p. 2–4]. Currently, Mr. Castagna owns his own online marketing company. [DE 99-9 p. 7]. He is also sophisticated enough to purchase a recreational vehicle for nearly $400,000, and prior to doing so, he contacted and spoke with Newmar's national sales manager six to seven times. [DE 108-10 p. 14]. Plainly, Mr. Castagna has the sophistication to appreciate this sort of agreement, and the Court cannot find that the limitation is unconscionable.

To be enforceable, however, the limitation must have actually been part of the agreement that Mr. Castagna entered. *Sanco, Inc. v. Ford Motor Co.*, 771 F.2d 1081, 1086 (7th Cir. 1985) ("[A] seller may not 'spring' a warranty disclaimer on a customer after a sale has been consummated; the parties must have understood that the warranty, and any disclaimers or limitations, were part of their deal."); *Rispens*, 621 N.E.2d at 1087 (holding that, while the limitation was not unconscionable, there were disputes of fact as to whether the buyer was aware of the limitation at the time of the sale, such that the limitation became part of the agreement, thus precluding summary judgment); *Hahn*, 434 N.E.2d at 949. Though the limitation is contained in the warranty document, Mr. Castagna states that he did not receive that document until after he purchased the vehicle. And though Mr. Castagna signed a warranty registration form at the time of the purchase, that form did not reflect the limitation on damages, nor did it confirm that Mr. Castagna had received the warranty itself.

Those facts create a genuine dispute as to whether this limitation of damages is enforceable. If Mr. Castagna was aware of the damages limitation at the time of the purchase,

then he would have assented to that provision by completing the purchase. *Rispens*, 621 N.E.2d at 1087 ("Assent to a limitation of liability may be assumed where a knowledgeable party enters into the contract, aware of the limitation and its legal effect, without indicating non-acquiescence to those terms."). There is evidence that the dealer's practice was to review all of the terms of a warranty with the buyer before the transaction, which would suffice if that actually occurred here. [DE 108-13]. As just noted, however, Mr. Castagna's affidavit states that he did not receive the warranty and did not know about the limitations until after the purchase, and the documents he signed at the time of purchase do not confirm that he received the warranty document itself. That creates a genuine dispute on this material fact, so the Court denies summary judgment on the enforceability of the damages limitation. *See Rispens*, 621 N.E.2d at 1087.

## V.  CONCLUSION

For those reasons, Newmar's motion for summary judgment [DE 99] is GRANTED in part and DENIED in part. Magnum's motion for summary judgment [DE 100] is DENIED. The motions to strike [DE 107, 116, 123] are each DENIED. The Court also intends to unseal Mr. Castagna's response and exhibits [DE 104] unless a properly supported motion to seal is filed within 14 days.

SO ORDERED.

ENTERED: September 11, 2018

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court